27 C.C.P.A. (Patents)

## LATHROP v. SHIPMAN.
### Patent Appeals No. 4326.

Court of Customs and Patent Appeals.
July 1, 1940.

A. D. Salinger, of Boston, Mass., and Harry E. Dunham, of Schenectady, N. Y. (William G. Edwards, Jr., of Schenectady, N. Y., of counsel), for appellant.

Wm. T. Hedlund, of New York City (Edmund A. Fenander, of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

October 29, 1935, a patent, No. 2,019,351, issued from the United States Patent Office to Harold F. Lathrop, relating to an air conditioning apparatus which contained a single claim. It was based upon an application filed November 17, 1934. August 25, 1936—approximately ten months after the patent was issued to Lathrop—Bennet Carroll Shipman filed an application for patent entitled "For Heat Exchanger" which, as filed, embraced thirty-five claims. April 26, 1937, Shipman tendered an amendment, seeking to add as claim 36, the claim of the Lathrop patent, for the purpose of securing an interference proceeding with Lathrop. After proceedings in the Patent Office, unnecessary to be related here, the proposed amendment was admitted in an amended form as claim 37, and on August 9, 1937, an interference was declared embracing a single count which reads as follows: "1. An attachment for an air conditioning device or the like including a casing of rectangular cross section, said casing being open at the ends thereof and having openings near the ends at the top and bottom thereof, a baffle of zig-zag cross section arranged longitudinally within said casing and in contact with the top and bottom walls of the duct, and means including a removable closure plate and a sheet of packing material for sealing the ends of said baffle and for dividing said casing into two ducts, one of said ducts communicating with the openings in the upper side of said casing and the other of said ducts communicating with the openings in the lower side thereof."

The count is identical in language with the claim of Lathrop's patent except for the omission of an immaterial clause of the claim.

It appears that during the period which is of importance here, Shipman, who was a consulting engineer, was not employed by any corporation but proceeded as an independent inventor. However, his application at the time of the declaration of the interference had been assigned to Servel, Inc., a corporation of Delaware, which corporation is the real party in interest in this proceeding. Shipman resided at San Mateo, California, at the time his invention was claimed to have been completed in 1933. He died prior to the time set for taking his testimony and the evidence on behalf of his assignee consists mainly of the testimony of parties residing in California who worked upon a device which was placed in evidence as Shipman's Exhibit A.

No testimony was taken on behalf of Lathrop (whose patent stands assigned to the General Electric Company, a corporation of New York) and the filing date of his application—November 17, 1934—is relied upon for conception and constructive reduction to practice.

In view of the fact that the Shipman application was filed subsequent to the issuance of the Lathrop patent it was incumbent upon Shipman's assignee to prove priority beyond a reasonable doubt.

The Examiner of Interferences reviewed the material evidence in the case and held that Shipman's assignee had failed to sustain the burden. So priority was awarded to Lathrop. Upon appeal the board took a different view and reversed the decision of the Examiner of Interferences, awarding priority to Shipman.

The instant appeal to this court followed.

We have carefully investigated the record in the case and given full consideration to the arguments presented.

As we view the case the only question which it is necessary for us to consider is whether Shipman's Exhibit A satisfies the terms of the count. Both the Examiner of Interferences and the board seem to have agreed that it had been satisfactorily established that the Shipman device had been completed and used prior to the filing date of Lathrop's application, but in his decision the Examiner of Interferences states his belief that the evidence and surrounding circumstances not only raise a doubt as to whether the device was considered successful, "but are considered to show beyond a reasonable doubt that it could not have been considered to have operated in a satisfactory and practical manner." Whatever might be held with respect to this finding (with which, of course, the board disagreed), it is our conclusion that clearly there is one structural feature of the count which Shipman's Exhibit A fails to meet.

The count is quite clear and the structure required by it, we think, may be visualized from a study of its terms. The board gave the following general description: "The subject matter of the issue is a heat interchanging device or recuperater for either heating or cooling air that is entering a room by interchanging heat with a stream of air flowing in the opposite direction, that is, out of the room. The device is suitable for use in air conditioning systems, but the count involves merely certain structure of the heat interchanger."

We also quote the board's description and discussion of Exhibit A, which contains a condensed statement of certain of the views of the Examiner of Interferences:

"Exhibit A is a heat interchanger said to be of actual full size for commercial use. It comprises an elongated rectangular casing which, as such, is open at the ends in the sense required by the count even though the extreme end is relatively narrow because the ends are somewhat tapered off on each side. The count, however, develops no detail precluding this shape. We think the casing may be said to have openings near the ends at the top and bottom. In Exhibit A these openings coincide with the tapered or bevelled portions of the ends. The structure, however, satisfies the count in this respect. Exhibit A has the required baffle or zig-zag cross section arranged within the casing to form alternating parallel passages in the opposed angles of the zig-zag structure. This satisfies the count in requiring that the casing have two ducts, one communicating with the openings in the upper side of the casing and the other communicating with the openings in the lower side thereof. Contention has arisen concerning two clauses of the count, namely, "means including a removable closure plate" and a part of the clause with respect to the baffle requiring it to be in contact with the top and bottom walls of the duct. The examiner holds that because the edges of the end plate are soldered in place in connection with the casing that these end plates are not properly called removable closure plates. The closure plates are also held by some side clamping bolts. The examiner holds that it is not established that the baffle comprising the inner structure of the casing is arranged in contact with the top and bottom walls of the casing or duct.

\* \* \* \* \* \* \* \* \*

"In respect to the first contention that the presence of a soldered joint between the closure plate and the casing precludes the former from being called a removable closure plate, it appears from the record that the closure plate was mainly held and clamped securely in place by the side bolts such as appear in Exhibits K and L which although photographs recently taken do not appear to be questioned as representing the structure as it existed up until later dissembled [disassembled] for removing the casing. While the soldering along the sides of the closure plate clearly helps hold it in place, it seems that the soldering was rather for the purpose of making an airtight joint rather than for attaching the plate. However, in any case it clearly ap-

pears of record that the joint is a simple, straight and exposed soldered joint and that the closure plate was detached merely by running a heating flame along the joint. It was thus removed without damage and could, if desired, be re-soldered in place. The count does not require that the closure plate be removable in any specific way but simply broadly removable. We consider this clause readable upon the structure of Exhibit A. Clearly, the folded edges of the zig-zag baffle plate in Exhibit A are in contact with the top and bottom walls of the casing. We regard this as obvious on mere inspection. The expression 'in contact' does not require that the baffle be definitely united with the walls of the casing but is satisfied if it, as stated, merely contacts or touches the top and bottom walls."

Whatever may be said with respect to the "zig-zag baffle" feature so discussed, we find ourselves unable to agree with the board respecting the "removable closure plate" feature. In Exhibit A the plate was soldered to the casing. It doubtless could be *"detached* merely by running a heating flame along the joint" (italics ours), as the board stated, and could be resoldered in place, if desired, but when the art involved is studied we do not think that any fair interpretation of the word "removable" justifies a holding that such a process of detachment meets the meaning of the word.

We agree with the following statement found in the decision of the Examiner of Interferences: " * * * the use of solder ordinarily and commonly indicates that the part attached to the device is to be stationary and integral therewith or fixed thereto. This is emphasized by the fact that other parts of exhibit A are soldered together to render them integral and keep them permanently in place and make the joint air tight. The term 'removable' as used in the count and interpreted in its ordinary sense connotes that the closure plate is to be attached thereto in such a manner that it can be detached therefrom without resorting to a partial destruction of the device as by the use of a torch. Moreover, the fact that the end plate was not removed until just prior to the taking of testimony in behalf of Shipman and then only for the purpose of obtaining a photograph of the 'zig-zag' inner structure of the heat exchanger and so that the witnesses could testify relative thereto, is convincing that the closure plate was not constructed with the idea of being 'removable'. The other closure plate is still intact and is integral with and stationarily fixed to the main body of the device."

The decision of the board is reversed, and priority is awarded to the party Lathrop.

Reversed.